## In re PEASE.

### (District Court, E. D. Michigan, N. D.   October 1, 1902.)

1. BANKRUPTCY—LIENS—MORTGAGE FOR BORROWED MONEY.

A mortgage given by an insolvent, subsequently and within four months adjudged a bankrupt, to secure money borrowed at the time for the purpose of preferring certain of his creditors, where the lender knew or had reason to believe that such was his purpose, is void under Bankr. Act July 1, 1898, c. 541, § 67e, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3449].

2. SAME.

A trust company, through its agent and attorney, who was also attorney for large creditors of a country merchant doing business at a distance, made a loan to such merchant, with which he at once paid certain creditors in full, including the clients of the agent, who received the money on their behalf directly from the lender. The loan was secured by a chattel mortgage on the borrower's stock, and on the next day after it was given, in accordance with the previous intention of the lender, it took possession of the stock, and proceeded to sell it out under the mortgage. The borrower was actually insolvent, but no steps were taken by the company or its agent to ascertain his condition. It did not appear that he was a party or consented to the taking possession of his stock, which was not provided for in the mortgage, and there had been no default. He was soon after adjudged a bankrupt. *Held*, that the transaction was evidently not in good faith, in the belief of the bankrupt's solvency, or for the purpose of assisting him to continue his business, but was apparently in the interest of the preferred creditors, and that the mortgage was void under Bankr. Act July 1, 1898, c. 541, § 67e, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3449].

### In Bankruptcy.

Perry D. Pease was adjudicated a bankrupt at a time when he was carrying on business in a small town of 600 inhabitants. He had, October 12, 1900, incurred debts to the amount of about $10,000, and estimated his stock in

---

¶ 1. See Bankruptcy, vol. 6, Cent. Dig. §§ 256, 257, 259, 261.

trade at about the same amount. On that day he borrowed $3,500, giving a mortgage on his stock to a security trust company. The mortgage was secured by a Mr. Chittenden, a lawyer, who, upon the giving of the mortgage, took possession of the stock and proceeded to sell it. Certain creditors of Pease attached the property, and on an inventory the stock was valued at $6,698. This appraisal, added to the goods sold by Mr. Chittenden after he took possession, shows the stock valued at about $7,298, leaving the indebtedness of Pease, above the amount of his stock, at about $2,700. Littman & Hoffstadt, creditors of Pease, had been pressing him for settlement at the time of the negotiation of this mortgage, and out of the proceeds of the mortgage their indebtedness, in the amount of $1,800, was paid. A portion of the money was also used to pay an indebtedness to the debtor's mother-in-law. The testimony of the trustee in bankruptcy was to the effect that sales by a mortgagee reduced the value of the stock that remained after the payment of the mortgage debt about 40 per cent. The testimony of Littman, who had been paid, as to his knowledge of the bankrupt's condition at the time of the payment, was unsatisfactory and contradictory, and was not sustained by the testimony of Chittenden, who negotiated the loan. Chittenden represented the trust company, for whom he had been in the habit of negotiating loans, and at the time he received the proceeds of the loan from the trust company he had notified Littman to be present, that his claim would be paid, and was authorized by him to receive and receipt for the money as his attorney.

Chittenden & Chittenden, for appellant.
Chauncy H. Gage and Searl & Montfort, for appellee.

SWAN, District Judge. The bankrupt's intent to prefer Littman & Hoffstadt and the other creditors, to pay whom he borrowed the $3,500, is conclusively shown by the facts, and was known to the agent of the trust company. Nor is there any question but that the intent and effect of the mortgage was to hinder or delay, if not defraud, his creditors. In re Goldschmidt, 3 Nat. Bankr. R. 168, 169, Fed. Cas. No. 5,520; In re McLam (D. C.) 97 Fed. 922.

The giving of the mortgage, therefore, was an act of bankruptcy, under subdivision 1, § 3, c. 541, Bankr. Act July 1, 1898, 30 Stat. 546, 547 [U. St. Comp. St. 1901, p. 3422], without regard to Pease's financial condition at the time. Insolvency of the debtor is not an element of that subdivision. Pease, being insolvent October 12, 1900, as is conceded, by the payment of Littman & Hoffstadt and his creditors for money borrowed, with the intent to prefer them over his other creditors, violated subdivision 2 of section 3 of the act. The act of the debtor being a preference, his intent is inferable from his act. In re Black & Secor, 1 Nat. Bankr. R. 361. Is the mortgage a lien upon the bankrupt's estate? By subdivision "a," § 67, c. 541, Bankr. Act:

"Claims which for want of record or for other reasons would not have been valid liens as against the claims of the creditors of the bankrupt shall not be liens against his estate."

By subdivision "d," § 67:

"Liens given or accepted in good faith and not in contemplation of or in fraud upon this act, and for a present consideration which have been recorded according to law, if record thereof was necessary in order to impart notice, shall not be affected by this act."

By subdivision "e," § 67:

"All conveyances, transfers, assignments or encumbrances of his property or any part thereof made or given by a bankrupt" within the specified period "with the intent and purpose on his part to hinder, delay or defraud his cred-

itors or any of them shall be null and void as against the creditors of such debtor, except as to purchasers in good faith and for a present fair consideration. * * *"

By subdivision "b," § 67:

"Whenever a creditor is prevented from enforcing his rights as against a lien created or attempted to be created by his debtor, who afterwards becomes a bankrupt, the trustees of the estate of such bankrupt shall be subrogated to and may enforce such rights of such creditors for the benefit of the estate."

It seems clear that these several subdivisions have a common purpose, and should be read together as collectively definitive of the essentials of a valid lien. It follows that no person can be a "purchaser in good faith" of any part of the bankrupt's estate, if title or security was accepted "in contemplation of or in fraud upon" the bankrupt act, or if for any reason it would not have been valid against the claims of creditors of the bankrupt. The propositions that advances may be lawfully made in good faith to a debtor to carry on his business, and that the lender may lawfully take security at the time for such advances without violating the bankrupt act, are beyond denial. "It makes no difference," says the court in Tiffany v. Boatman's Inst., 18 Wall. 375, 21 L. Ed. 868, "that the lender had good reason to believe the borrower to be insolvent, if the loan was made in good faith, without any intention to defraud the provisions of the bankrupt act." This was held in construction of section 35 of the bankrupt act of 1867, 14 Stat. 534 (Rev. St. § 5129), which avoided "any conveyance, transfer or other disposition of the property of an insolvent, if the grantee had reasonable cause to believe the grantor insolvent, and that the conveyance was made to prevent the property coming to the assignee in bankruptcy, or to prevent the same from being distributed under the act, or to defraud the object of, or in any way impair, hinder, impede or delay the operation and effect of, or to evade any of the provisions of this title." These two elements must have concurred in the transaction to avoid the conveyance. It was not enough that the grantor was believed to be insolvent in order to defeat the title of the grantee, but it must also appear that the grantee knew that the conveyance was made with a view to effect any purpose prohibited by the act. If that is shown, it avoids the transfer. Even though a present fair consideration for property transferred to the hindrance, delay of, or in fraud upon creditors, it will not save the conveyance. "A sale may be void for bad faith, though the buyer pays the full value of the property bought." This is the consequence where his purpose is to aid the seller in perpetrating a fraud upon his creditors, and where he buys recklessly, with guilty knowledge. Clements v. Moore, 6 Wall. 312, 18 L. Ed. 786; Cadogen v. Kenneth, 2 Cowp. 432; Walbrun v. Babbitt, 16 Wall. 581 (bottom), 21 L. Ed. 489.

The decisions under the acts of 1841 and 1867 are to the same effect as Tiffany v. Boatman's Inst., 18 Wall. 375, 21 L. Ed. 868, viz., that it is essential to the validity of security for a loan to one adjudged a bankrupt within four months thereafter that the transfer was had "without any intention to defraud the provisions of the bankrupt act."

In Re Butler, 4 Nat. Bankr. R. 308, 120 Fed. 100, the bankrupt borrowed from one Mendell, upon mortgage of his stock in trade,

$1,600 to pay one Cushman, an unsecured creditor, who was pressing for payment. Kimball, a clerk or partner of Cushman's, suggested to the mortgagee the loan to Butler upon security, and to Butler, the bankrupt, that Mendell would probably lend him the money. Mendell made no inquiry into the condition of Butler's affairs, but relied mainly upon the advice of Kimball and Cushman. Judge Lowell held that the money was raised for the express purpose of paying an antecedent debt, and that the intent to prefer the creditor was plainly inferable; that the mortgage was out of the ordinary course of the business of the bankrupt, because he was a retail dealer, doing a business of about $100 a day, and a mortgage of such a trader's full stock is a confession of insolvency—citing Nary v. Merrill, 8 Allen, 451. He dismissed the petition of the mortgagee for payment of his mortgage· debt from the proceeds of sale of the property. The case is very like that at bar in its main features. In the latter, however, the attorney for the mortgagee was also attorney for the principal preferred creditor.

In Bucknam v. Goss, 13 N. B. R. 337, Fed. Cas. No. 2,097, Judge Fox held that a mortgage given by one subsequently adjudged a bankrupt in part to prefer the mortgagee as to his claim, and in part to secure a present loan made for the purpose of enabling the debtor to pay another creditor, was entirely void.

In Fox v. Gardner, 21 Wall. 475–480, 22 L. Ed. 685, it is said:

"The right of an insolvent person, before proceedings are commenced against him, to pay a just debt, honestly to sell property for which a just equivalent is received, to borrow money, and give a valid security therefor, are all recognized by the bankrupt act, and all depend upon the same principle. In each case the transaction must be honest, free from all intent to delay or defraud creditors or to give a preference, or to impair the estate. If there is fraud, trickery, or intent to delay or prefer one creditor over others, the transaction cannot stand."

In the case of In re Soudan Mfg. Co., 113 Fed. 804, 51 C. C. A. 476, it was held that under section 67d of the bankrupt act the validity of a mortgage given to secure a present loan of money within four months prior to the borrower's bankruptcy does not depend upon his solvency at the time, or upon notice of his financial condition by the mortgagee, actual or constructive; but to invalidate such a mortgage it must be shown that the borrower was insolvent, that the purpose of the loan was to accomplish unlawful preference or otherwise violate the act, and that the lender knew or was chargeable with knowledge of both of such facts. In that case the mortgage was upheld upon the facts in the case, which did not imply insolvency of the borrower.

In Re Beerman, 7 Am. Bankr. R. 431, 112 Fed. 663, a firm creditor of an insolvent debtor a month before his bankruptcy procured a third person to lend money to pay his debt to the firm upon a mortgage upon the debtor's stock, and a bond of indemnity from the firm against loss, the lender understanding that the money was to go to the firm, and the firm received it. The mortgage was held void under the bankrupt act, since it would enable the creditor to obtain by indirection a preference which he would have been unable to get if he had dealt directly with the debtor. Upon a like state of facts Judge Coxe held a transfer of property by the bankrupt void as a preference. In re Minnie McGee, 5 Am. Bankr. R. 262, 105 Fed. 895.

The validity of a dealing assailed as a preference is determined by its purpose and effect, and not by its form. In Stern, Falk & Co. v. Trust Co., 7 Am. Bankr. R. 305–308, 112 Fed. 501, where the creditors of a bankrupt firm were disallowed because they had refused to surrender proceeds of the bankrupt's estate acquired by collusion with the assignee of the bankrupt, Judge Severens said:

"In respect to the means by which the transfer is effected there is no limitation. However devious the method, if the result is that but for the act the creditor acquires property from the debtor which is subject at law or in equity to be appropriated to the satisfaction of the debtor's obligations, that is a transfer, within the meaning of the act."

Under the act of 1867 it was held that the first clause of the thirty-fifth section of that act, which corresponds to section 60 of the present act, had reference only to transfers of property to pre-existing creditors of the bankrupt, and that a transaction original and complete in itself, founded on the present consideration and had with one having no previous relations with the bankrupt, could only be assailed under the second clause of the thirty-fifth section of the former act, which is the equivalent of section 67 of the present act. Bean v. Brookmire, 1 Dill. 25, Fed. Cas. No. 1,168; Gibson v. Warden, 14 Wall. 244, 20 L. Ed. 797.

By a parity of reasoning it may be that the facts of the case at bar bring it under section 67, subds. "d," "e," and exclude the applicability of section 60, subds. "a," "b," because the Security Trust Company had had no dealings with the bankrupt prior to the loan of October 12, 1900. This, if conceded, would not aid the validity of the mortgage in controversy; for, if good faith is the sole criterion of the validity of a transfer upon a present consideration, that element cannot inhere in it, where the lender knew or had reason to believe that the grantor was insolvent, and that the purpose of the loan was to enable him therewith to defeat any provision of the bankrupt act. "If the vendor's purpose in selling is to defraud his creditors" (and it might be added, "or to hinder or delay them"), "or if it is to work a fraud upon the law by illegal payments, preference, or the like, and the purchaser knows, or has good reason to believe, that such is the purpose of the vendor, then the purchase is void." Darby v. Lucas, 1 Dill. 170, Fed. Cas. No. 3,573.

Under the second clause of section 35 the act of 1867 includes any disposition of property by one insolvent or in contemplation of insolvency if the recipient had reason to believe the grantor to be in either of these conditions, "and that the act was done by him to prevent the property from coming into the hands of his assignee in bankruptcy and from being distributed under the bankrupt law." Gibson v. Warden, 14 Wall. 249, 20 L. Ed. 797. The sixty-seventh section of the act of 1898 is entitled to quite as broad construction to effectuate the purpose of the law as that given to the second clause of section 35 of the prior act. If a volunteer purchaser or incumbrancer of an insolvent's property, having knowledge or means of knowledge of his actual insolvency and of his purpose by the transfer to defeat the provisions of the bankrupt act, is protected as a bona fide purchaser upon the bankruptcy of the grantor within four months, while any unse-

cured creditor who, without reasonable cause to believe the debtor is insolvent, has received part payment upon his claim, must surrender such payment as preferential before he can prove for the balance of his claim, the object of the bankrupt act may easily be thwarted. The creditor has only to obtain a loan to the bankrupt, and receive payment of his full claim from the proceeds.

In Tiffany v. Boatman's Institution, 18 Wall. 375–388, 21 L. Ed. 868, the court upheld the validity of a loan to one Darby, who is described as "a man of large property and large debts," and "of wonderful energy and capacity for business." Darby borrowed the money to take valuable securities out of pledge and to prevent their sacrifice. Neither he nor the lender contemplated any fraud upon creditors. Their redemption was a benefit to creditors. The testimony was in conflict as to Darby's commercial solvency at the time of the loan. The case of Tiffany v. Lucas, 15 Wall. 410, 21 L. Ed. 198, sustained a sale of property by Darby. While these decisions are often cited as holding that good faith is the only test of the validity of a transfer by one subsequently adjudged a bankrupt, and that "it makes no difference that the lender had good reason to believe the borrower insolvent, if the loan was made in good faith without any intent to defeat the provisions of the bankrupt law," they are not authorities for the doctrine that under the act of 1898 one actually insolvent can make any transfer of property, even for a present consideration, to one who knows or had the means of knowing of his financial condition and his purpose to evade the bankrupt act. Under the act of 1867, a person was insolvent who could not pay his debts as they matured. This condition might well consist with the possession of ample property to meet them if an extension of time could be had. For that reason it was held the loan to one known to be commercially insolvent to enable him to avoid bankruptcy was a legitimate transfer if no fraud upon the bankrupt act was intended. Where, however, one's debts exceed the value of his property, there is no reason why one who knows that fact and its necessary consequences to creditors of the borrower, and lends him money upon the security of his property, to be applied in preferring one or more of his creditors or to hinder or delay the insolvent's creditors, should be held a preferred creditor.

One actually insolvent has no equitable interest in what is only nominally his property. The effect of his transfer is to hinder, delay, and defraud his other creditors without the hope or possibility of benefiting himself. The reasons for sustaining a sale or security given by one commercially insolvent in the effort to save his business and avoid bankruptcy have no application to one who has lost everything, and who by a sale or mortgage of his property necessarily withdraws it, in whole or in part, from the reach of creditors. Both lender and borrower are chargeable with knowledge of the obvious effect of the transaction upon unsecured creditors, and with colluding to defeat the bankrupt act, if the insolvent seasonably becomes a bankrupt. Had the Security Trust Company in this case been a pre-existing creditor of Pease its security for its debt would have been indefensible. It is equally so when it ignored the means of knowledge of the grantor's

hopeless insolvency, and knowing that the money was to be used to pay unsecured pre-existing debts. A loan of that character is not sanctioned by the reasoning in either Tiffany v. Boatman's Inst., supra, or Tiffany v. Lucas, 15 Wall. 410–424, 21 L. Ed. 198, in neither of which was the vendor known to be even commercially insolvent. It seems clear from these considerations that, although a present consideration passed to Pease for the mortgage, the avowed purpose and necessary effect of the transaction, under the facts in this case, deny to the mortgagee the character of a purchaser in good faith. The agent and attorney of the Security Trust Company admits that he knew before he went to Ashley that Pease wanted the loan to pay Littman & Hoffstadt (who had been his clients for several years, and had consulted him about their claim against Pease), and other creditors whose claims were long overdue, and that the Security Trust Company knew that Littman & Hoffstadt were to be paid from the loan, yet the proofs show that he made no inquiry into Pease's indebtedness beyond asking him if there were any judgments against him or incumbrance upon his property. Littman had been persistent in pressing Pease for payment, and when told by Pease, about a week before the mortgage was given, that his efforts to borrow money in Ithaca had failed, assured Pease that he would get it for him. Littman denies this, but the facts tend to corroborate Pease. The proofs show that Littman was at Ithaca when the mortgage was executed, having been informed by Chittenden and by Pease that he would get his money that day from the proceeds of the loan. At Littman's suggestion Pease gave Chittenden an order on the Security Trust Company for Littman's claim of $1,842, and that sum was paid to Chittenden at Toledo by the mortgagee, and Chittenden paid it to Littman. The proofs are convincing that the loan was made and the security taken primarily to secure payment of the claim of Chittenden's clients, Littman & Hoffstadt, in the belief founded upon an overvaluation of the stock, and Pease's estimate —which was a mere guess—that he had a margin of $2,000 or $3,000 of assets over his liabilities. This guess, however, was discredited by Pease's express admission, abundantly established by his own testimony and that of Mr. Matthews that he did not know how much he owed. The means for ascertaining the exact amount of his indebtedness were at hand, but were not called for. Mr. Chittenden does not claim that he asked Pease for either his books or his invoices of his stock. Pease kept no books, but that, it seems, was not known to Chittenden. Pease had no difficulty in making up from his invoices of stock a schedule of his creditors and their claims when he filed his petition in bankruptcy, and its correctness has not been questioned. Indeed, the admission of counsel for the mortgagee that he was insolvent when the mortgage was given leaves that fact beyond controversy. It is equally certain that examination of the invoices of his purchases would have disclosed Pease's indebtedness for his stock. This, added to his debts for borrowed money, would have demonstrated, even on Chittenden's estimate of the stock, that he owed more than he could pay. These facts liken this transaction to that condemned in Waldrun v. Babbitt, 16 Wall. 577–582, 21 L. Ed. 489, where the title of a purchaser, who bought, without inquiry as to the vendor's

financial condition, the stock of a country trader, was sought to be defended on the ground that he had paid full value in ignorance of the condition of the seller's business. The purchaser limited his inquiry to the trader's object in selling out and his future purpose. The court held that a sale of that kind imported the seller's fraudulent intent, and put the buyer on inquiry, adding:

"Something more was required than this information of the trader's object and future purpose, which the law raised in the mere fact of a retail merchant selling out his entire stock of goods. If this sort of information could sustain the sale, the provision of the bankrupt law we are considering would be no protection to creditors in Mendelson's situation, and with the purpose he had in view would be likely to give the party with whom he was dealing a plausible reason for his conduct. The presumption of fraud arising from the unusual nature of the sale in this case can only be overcome by proof on the part of the buyer that he took the proper steps to find out the pecuniary condition of the seller. All reasonable means pursued in good faith must be used for this purpose. * * * In choosing to remain ignorant of what the necessities of his case required of him to know, he took the risk of the impeachment of the transaction by the assignee in bankruptcy in case Mendelson should be adjudged a bankrupt within the time limited in the statute."

This duty of inquiry was reiterated in Wager v. Hall, 16 Wall. 584–600, 21 L. Ed. 504.

Neither the Security Trust Company nor its agent and attorney at any time contemplated aiding Pease to continue his business and avoid bankruptcy, as was the purpose of the lender in Tiffany v. Lucas, supra. When Mr. Niles agreed with Chittenden to make the loan, conditioned on the latter's approval, it was agreed between them that Pease should be ousted from possession at once, and a custodian should take charge of the stock. This was done immediately, on Chittenden's telegram, the same day the mortgage was delivered, and without notice to Pease of that purpose or the significance of the presence of Cummings, the custodian sent by Niles, although, as Chittenden admits, Pease had not violated any condition of the mortgage, nor is it claimed that he was informed that the mortgagee in so doing was acting under the insecurity clause of the mortgage. Thereupon, within two or three days after the execution of the mortgage, handbills announcing a chattel mortgage sale of the stock under the order of the Security Trust Company were scattered broadcast by Chittenden's orders, although no installment of the mortgage debt was due. Pease was surprised by these acts. His request for a loan to help him "pull through" had been nominally granted. The lender "kept the word of promise to the ear, but broke it to the hope." The consequences in no degree exculpate him from the charge of violation of the bankrupt act in making a transfer for a purpose, in fraud of the act. He had armed the lender with the power to appropriate his property to the hindrance and delay of his creditors, and must be presumed to have intended the natural consequences of its exercise, although he was not bound to anticipate its abuse. Clarion Bank v. Jones, 21 Wall. 327, 22 L. Ed. 542.

The evidence shows without conflict that the necessary effect of the slaughter of the stock effected by the course pursued and the reckless manner in its disposition of the mortgagee impaired the value of what remained and sacrificed the interests of unsecured creditors

whose only fund it was. There is evidence that no bank would have made the loan as an investment on the security offered. The utmost profit it could have yielded to the lender, had its terms been.met by Pease, would have been about $52, the interest on the money to the maturity of the debt. The paucity of that incentive to a loan to an unknown country merchant doing business in a small village distant 130 miles or more from Toledo, and confessedly and obviously unable to pay either his business indebtedness or long-standing debts for borrowed capital, the arbitrary and premature steps deliberately taken against the property, and the relation between the attorney for the lender and the preferred creditors of the bankrupt, are little short of conclusive that the real purpose of the loan was in this circuitous way to obtain the preference for Littman & Hoffstadt, and that accomplished to sacrifice the mortgaged property for payment of its own debt, ignoring alike the terms of the mortgage and the interest of Pease's creditors. The facts throw the burden upon the mortgagee to exculpate itself, and this has not been met. The course taken in the enforcement of the security was not authorized by the mortgage. If, as is claimed by Mr. Chittenden, it was consented to by Pease as a condition precedent to the loan, it is singular it was not embodied in the mortgage. It proves also it was not taken under the insecurity clause. It was not notified to Pease's creditors by the records of the mortgage, and it substituted another security for that evidenced by the instrument and its record. Such substituted security was not a lien for "want of record," under section 67 of the act and the statutes of Michigan. Under the testimony and accepting the recorded mortgage as a measure of the rights of the parties, the action of the mortgagee was a premeditated wrongful conversion of the property, and an intentional disregard of the rights of the mortgagor and his creditors and to their injury. Woods v. Gaar, Scott & Co., 93 Mich. 147, 53 N. W. 14.

While the consequence to Pease's creditors of this action would not defeat the mortgage, if valid, yet they tend to show that the purpose of the lender was not the relief of the mortgagor or the preservation of his business, as he was led to believe, but the contrary. This is further evidenced by the fact that at least $350 of the "expenses" charged to Pease, and apparently allowed as covered by the mortgage, were all incurred, as Mr. Chittenden admits, in contesting the claims of Pease's attaching creditors, and are not proper charges against Pease's estate. There are other "expenses" allowed the mortgagee against the bankrupt's estate quite as open to challenge. These charges also impugn the good faith of the mortgagees, who are responsible for and charged with knowledge of all facts known to Mr. Chittenden, who was their attorney in the transaction, and, though he testifies he was "not retained," acted also for Littman & Hoffstadt. The Security Trust Company knew that Pease intended to pay Littman & Hoffstadt's claim out of the proceeds of the loan—Mr. Chittenden had so informed them—and he knew that the claim was not due, and that its payment would work a preference. He not only shut his eyes to Pease's financial condition, but made no inquiry to learn whether Pease had other property, "because," as he admits, he "was not interested in that." Disregarding the mortgage, and under the alleged anterior agreement

with Pease inconsistent with its provisions, but of no legal efficacy, he practically destroyed the only available fund for creditors—the stock, which he said was worth $8,000—to enforce premature payment of $3,-267 by a course which he apparently premeditated when he accepted the loan, but did not disclose until the delivery of the security. His acts and knowledge are those of the mortgagee, who knew not Pease, but committed the conduct and consummation of the loan to him, Rogers v. Palmer, 102 U. S. 263, 26 L. Ed. 164; The Distilled Spirits, 11 Wall. 356, 20 L. Ed. 167; Smith v. Ayer, 101 U. S. 320, 325, 326, 25 L. Ed. 955.

The facts disprove the good faith of the Security Trust Company in the transaction, and the finding of the referee in its favor, holding its debt a secured claim, is reversed, and its mortgage is decreed to be void.

The finding of SWAN, District Judge, was affirmed by the United States Court of Appeals, Sixth Circuit.